IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS, SPRINGFIELD DIVISION

| | | |
|---|---|---|
| TITAN INTERNATIONAL, INC., et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No.  00-3257 |
| | ) | |
| GEORGE BECKER, et al., | ) | |
| | ) | |
| Defendants. | ) | |

### ORDER

BYRON G. CUDMORE, U.S. MAGISTRATE JUDGE:

This matter comes before the Court on the International Union Defendants' Motion for Discovery Sanctions and Memorandum in Support Thereof (d/e 244) (Motion for Sanctions), and Plaintiffs' Compliance with Magistrate Judge Cudmore's Order of May 5, 2005 (d/e 280) (Titan's Compliance).[1]  In its May 5, 2005, Order (d/e 263), this Court stayed ruling on

---

[1] The group of Plaintiffs referred to as "Titan" consists of Titan International, Inc., Titan Tire Corporation, Titan Tire Corporation of Natchez, and Titan Wheel Corporation of Illinois.
  The group of Defendants referred to as the "International Union Defendants" consists of the following: the United Steelworkers of America AFL-CIO, CLC ("USWA"), USWA Districts 1, 7, 8, 9, 10, 11, and 12, the USWA Titan International Council, George Becker, Ronald Bloom, Terry Bonds, Bruce Bostick, Richard Davis, David Foster, Leo Gerard, Tom Johnson, Leon Lynch, Alfredo Martinez, David McCall, Andrew Palm, Jack Parton, John Puskar, John Sellers, Billy Thompson, Tom Wiliford, Homer Wilson, and Michael Yoffee.
  The group of Defendants referred to as the "Local Union Defendants" consists of the following: USWA Local Union 164, USWA Local Union 303, Leo T. Bradley (in his official capacity), John Peno (in his official capacity), John Carrol, Ron King, Dick Larson, Jim

sanctions arising from Titan's failure to comply with this Court's November 30, 2000, Order (see d/e 4 and November 30, 2000, endorsed Order) (November 2000 Order), and November 26, 2002, Order (d/e 95) (November 2002 Order), with respect to email, and ordered Titan to respond to a series of questions. See May 5, 2005, Order, pg. 34. The Court sanctioned Titan for other discovery violations of its November 2000 and November 2002 Orders. Id. at 35.

Both the International Union Defendants and Titan have requested a hearing on the remaining issues. See Corrected Response to Plaintiffs' Notice of Compliance with the Court's May 5, 2005 Order (d/e 285) (Defs. Response to Compliance), pg. 4 n.1; Response to the International Union Defendants' Supplemental Brief on Titan's Compliance with the Court's May 5, 2005 Order (d/e 295) (Titan's Response), pg. 21. The Court is more than capable of ruling based on the parties' pleadings. The parties' request for a hearing is denied.

## BACKGROUND

The procedural history underlying the issues before the Court has been described elsewhere. See May 5, 2005, Order. Herein the Court addresses

---

Maher, Ron Smith, and Paula Wilkes.

the International Union Defendants' contention that Titan destroyed and/or withheld email during discovery, despite the November 2000 Order's direction to preserve email relating to the issues raised in the Complaint (d/e 1), and later, the Amended Complaint (d/e 8) (Am. Complt.), and the November 2002 Order's command to produce documents responsive to the International Union Defendants' First Requests for Production Nos. 4 and 5. Due to Titan's inadequate response to the International Union Defendants' allegations, the Court ordered Titan to answer the following questions on or before June 10, 2005:[2]

> (a) did Titan's counsel, in writing, direct Titan to preserve documents as directed by the November 2000 Order; (b) what methodology, if any, has Titan employed to assure that relevant email has been preserved; and © what email, if any, has been preserved for the period addressed in the Complaint; (d) when did the Titan International, Inc. legal department implement its stand-alone email system; (e) is that email system backed up; and (f) does Titan possess responsive, non-privileged email messages to and from [Cheri] Holley that have not yet been produced to the International Union Defendants?

Id. at 34-35.

---

[2]The Court notes that the significance of question (a) was minimized by District Court Judge Scott's June 6, 2005, Order (d/e 276), in which she noted, "Titan was bound by the Joint Stipulation and was subject to the Court's November 30, 2000, Order approving the Joint Stipulation, regardless of how Titan's counsel communicated that information to Titan." Id., pg. 7 n.1.

On June 10, 2005, Titan filed its Compliance, along with affidavits from Titan Vice-President, Secretary, and General Counsel Cheri T. Holley, and paralegal Jennifer Cramm. Titan's Compliance, Exhs. A & B. In response to this Court's questions (a), (b), and (c), Ms. Holley attested:

> The methodology employed to assure relevant e-mail would be preserved was to identify who, at Titan, had e-mail, and whether there was any reasonable basis to believe that these persons would have communications relevant to the RICO lawsuit. Due to the limited use of e-mail at Titan during the period of the strike, as described in the affidavits previously submitted to the court, the only such person is Titan's paralegal, Jennifer Cramm. All e-mail sent and received from Ms. Cramm has been preserved. Given her position, there are no non-privileged e-mail messages sent or received by Ms. Cramm because she only communicates by e-mail with Titan's outside counsel to send and receive confidential attorney-client communications and attorney work product.

Id., Exh. A, Affidavit of Cheri T. Holley (Holley Aff.), ¶ 5. Further, Ms. Cramm attested: "E-mail sent and received on Titan's corporate e-mail system . . . has been maintained to the extent it has been printed and filed by the individual senders and recipients. No such e-mail pertains to the issues presented in the RICO lawsuit." Id., Exh. B, Affidavit of Jennifer Cramm (Cramm Aff.), ¶ 3.

In response to this Court's questions (d), (e), and (f), Ms. Cramm attested that the Titan legal department initiated its stand-alone system in July 2002; that all email sent and received through the system has been printed and saved; and Titan has no responsive, non-privileged email from or to Ms.

Holley. Id., ¶¶ 4-5.

This Court then requested that the International Union Defendants respond. The International Union Defendants argue that Titan did not, in fact, comply with this Court's May 5, 2005, Order, and that the evidence regarding Titan's lack of compliance with the November 2000 and November 2002 Orders shows that its Motion for Sanctions must be allowed. In Titan's Response (d/e 285), Titan argues that it complied with the Court's May 5, 2005, Order, and that no email was withheld in violation of the November 2000 and November 2002 Orders. For the reasons set forth below, the Court allows the remainder of International Union Defendants' Motion for Sanctions.

## ANALYSIS

A.  TITAN'S VIOLATION OF THE COURT'S NOVEMBER 2000 ORDER

This Court's November 2000 Order clearly stated Titan's on-going obligation to preserve electronic mail messages (email) relevant to the allegations set forth in the Complaint, and by extension, the Amended Complaint. The November 2002 Order directed Titan to produce all

documents, which includes email, responsive to the International Union Defendants' First Requests for Production Nos. 4 & 5.[3]

In the Amended Complaint, Titan claims damages arising from bomb threats (¶¶ 105-118), acts of physical violence and property damage (¶¶ 119-227), and filing of baseless workers' compensation claims (¶¶ 228-398) (jointly, the RICO claims).  Am. Complt.  Titan also alleges interference with Titan's business relations (¶¶ 399-443), including disseminating false information at trade shows (¶¶ 401-411), publication of false information on the Internet (¶¶ 412-431), filing a frivolous and objectively baseless shareholder derivative lawsuit (¶ 432), and interfering with Titan's relationship with Harris Bank (¶¶ 433-443) (jointly, the Interference Claims).  Id.

Titan's Fifth Claim, alleging Tortious Interference with Prospective Business Relations, alleges that the Defendants interfered with Titan's business relationships and caused: "(a) . . . Harris Bank to breach its contract with Titan and to decrease its line of credit to Titan and . . . other banks and lending institutions to refrain from doing business with Titan; (b) . . .Titan's [workers' compensation] insurer to cancel its policy with Titan and . . . other

---

[3]The November 2000 Order is not defined by any specific time period (i.e., the period of the strikes), but rather, is defined by its relevance to the allegations set forth in the Complaint and by extension, the Amended Complaint.

insurers to refrain from providing policies to Titan at market rates; (c) . . . certain of Titan's customers and shareholders to cease doing business with or investing in Titan; and (d) . . . employees and independent contractors doing business with Titan . . . to cease doing business with Titan." Id., ¶ 469.

Accordingly, due to the breadth of the allegations set forth in the Amended Complaint, it is clear that Titan was obligated to preserve a wide-range of information by the November 2000 Order, including email.

The Holley Affidavit is surprisingly bereft of useful information regarding Titan's methods for performing its duty under the November 2000 Order. Ms. Holley attests that Titan's procedure for complying with the November 2000 Order with respect to email included two steps: first, identify which Titan employees had email, and second, evaluate "whether there was any reasonable basis to believe that these persons would have communications relevant to the RICO lawsuit." Titan's Compliance, Exh. A, Holley Aff., ¶ 5. Ms. Holley never attests to who performed the evaluation, and never defines what a "reasonable basis" for concluding that a Titan employee could have relevant email.[4] Further, she never states when such an evaluation was

---

[4] Titan's counsel states that it was Ms. Holley who performed this evaluation. Titan's Response, pgs. 3-4. Yet a plain reading of Ms. Holley's Affidavit shows that she never takes the credit.

performed, or whether it was performed on an on-going basis.[5]  Incredibly, from this incomplete account Ms. Holley's affidavit attests that only Titan's paralegal, Ms. Cramm, has relevant email, which she conveniently concludes is protected from disclosure by the attorney-client privilege.  Id.

The Cramm Affidavit is similarly unhelpful.  She attests in conclusory form that none of the email preserved by Titan "pertains to the issues presented in the RICO lawsuit."  Id., Exh. B, Cramm Aff., ¶ 3.  Although she claims personal knowledge of this fact, Ms. Cramm never describes how she came by this knowledge.  Id., ¶ 2.  For example, did she personally conduct a review of email saved in Titan employee files?  If so, when did this review take place?  Further, Ms. Cramm never describes her qualifications for determining the relevance of preserved email under the November 2000 Order.  Unlike Ms. Holley, Ms. Cramm does not attest to ever being involved in the lawsuit in any substantive role, and she is not an attorney.

Both the Holley and Cramm Affidavits are flatly contradicted by relevant email submitted to the Court by the International Union Defendants, which

---

[5] Titan's counsel assumes that this evaluation occurred "at the time of the Court's November 2000 preservation order", and, as of that point, "relevant e-mail communications did not exist."  Titan's Response, pg. 4.  The Court respectfully disagrees with counsel's reading of Ms. Holley's Affidavit.  If that was the case, however, Titan would clearly be in breach of its on-going obligations under the November 2000 Order to preserve email germane to the allegations set forth in the Amended Complaint.

falls within the bounds of the November 2000 Order.  For example, a May 23, 2001, email from Bill Campbell to Morry Taylor forwarded three attached spreadsheets comparing warranties.  In the body of the email, Campbell wrote, "Morry, This seems to be the latest reason why sales are down.  Your thoughts? Bill[.]" Defs. Response to Compliance, Exh. 2, T 20133.  A July 20, 2001, email from Fred Taylor to Scott Jones, carbon copied to Morry Taylor (among others), suggests that lack of internal cohesion hurt Titan's ability to sell tires.  Id., T 20151.  A September 6, 2001, email from Ronald Blanshan from John Deere, Inc., to Janet Bichsel, for delivery to Morry Taylor, described a problem with a Titan tire installed on a John Deere machine.  Id., T20155.  An October 9, 2000, email from Scott Smith to Morry Taylor, forwarded a document entitled, "I-Maurie-Quality Issues.doc", along with 33 .jpg pictures of tire defects.  Id., T 20188.  Together, these email suggest plausible alternate reasons for Titan's business woes, beyond the allegations Plaintiffs set forth in the Amended Complaint.

Titan's attempts to rebut the International Union Defendants' claim that the aforementioned email–T 20133, T 20151, T 20155, and T 20188–are relevant and qualify for preservation under the November 2000 Order are de minimis at best.  In fact, the email labeled T 20155 and T 20188 are not

discussed in the Titan's Response, nor do they appear in Titan's email chart. Titan's Response, Exh. 2, Titan's Analysis of E-Mail Submitted By IUD (Titan Chart). Email T 20133 is listed in the Titan Chart, but Titan's rebuttal is limited to the word "no" in the column labeled "responsive?". Id., Exh. 2, Titan Chart at 1, 6. As for email T 20151, Titan argues that the email does not absolve the International Union Defendants from allegedly false statements published in an October 13, 1999, issue of the union sheet, Solidarity News. Id., pgs. 15-16. However, the email is relevant as a plausible alternate explanation for Plaintiffs' declining sales and should have been preserved on that basis alone.

Instead, Titan's counsel spends pages and the Court's time attempting to obfuscate the matter at issue. For example, Titan's counsel focuses on two email sent by Mr. Taylor's secretary, which are clearly irrelevant under the November 2000 Order, while sidestepping a direct analysis of those email received by Mr. Taylor and discussed above. Titan's Response, pgs. 6-7. In addition, Titan's counsel attempts to focus the Court's analysis completely under the November 2002 Order, when it knows full well that it is the November 2000 Order that mandates the retention of email relevant to the allegations set forth in the Amended Complaint. Id. at 9. Titan's repeated claims that it could not have known in 2000 what the International Union

Defendants would request in March 2002 are beside the point. The Amended Complaint and the Complaint were Titan's guides for preservation of relevant discoverable information, including email.

Accordingly, the Court concludes that the Holley and Cramm Affidavits indicate that Titan willfully violated the terms of the November 2000 Order.[6] Not only did Titan fail to implement a procedure for preserving relevant email, but also such relevant email clearly exists. The Court need look no further than the first email presented to it for review by the International Union Defendants. Therefore, the Court allows the International Union Defendants' Motion for Sanctions with respect to the email issue.

B.   DISCOVERY SANCTIONS

As noted in the Court's May 5, 2005, Order, sanctions are appropriate under Federal Rule of Civil Procedure 37(b)(2) when a party fails to comply with a discovery order and the district court finds that "willfulness, bad faith or fault" justifies the sanction. Downs v. Westphal, 78 F.3d 1252, 1257 (7th Cir. 1996). Once a court has determined that its discovery order has been willfully

---

[6]The Court anticipates Titan's objection that the Holley and Cramm Affidavits strictly answered the Court's questions presented in the May 5, 2005, Order. In fact, the Court's decision not to levy sanctions against Titan based on their inadequate responses to the International Union Defendants' Motion on the email issue at that time was a show of restraint. The Court gave Titan a clear chance to convince the Court that Titan had performed its duties under the November 2000 Order. Titan's artfully worded affidavits are unequal to that task.

violated, it has broad discretion to impose sanctions appropriate to the violation. Langley by Langley v. Union Elec. Co., 107 F.3d 510, 513 (7th Cir. 1997). Although a district court need not "select the 'least drastic' sanction, district courts should only impose sanctions that are 'proportionate to the circumstances surrounding a party's failure to comply with discovery rules.'" Rice v. City of Chicago, 333 F.3d 780, 784 (7th Cir. 2003), quoting Melendez v. Illinois Bell Telephone Co., 79 F.3d 661, 672 (7th Cir. 1996).

Dismissal is the most extreme sanction available to the Court under Rule 37. The "fault" required to sustain dismissal under Rule 37 does not refer to the "non-complying party's subjective motivation", but to the lack of reasonableness that "eventually culminated in the violation." Langley by Langley, 107 F.3d at 514 (quotations and citations omitted). The Seventh Circuit has noted that "even without 'a clear record of delay, contumacious conduct or prior failed sanctions,' a court can apply the sanction of dismissal for Rule 37 violations with a finding of willfulness, bad faith or fault, as long as it first considers and explains why lesser sanctions would be inappropriate." Maynard v. Nygren, 332 F.3d 462, 468 (7th Cir. 2003). A district court need not impose lesser sanctions before resorting to dismissal. Halas v. Consumer Servs., Inc., 16 F.3d 161, 165 (7th Cir. 1994).

The International Union Defendants are entitled to discovery sanctions for Titan's violation of the November 2000 Order with respect to email, and the discovery violations already discussed in this Court's May 5, 2005, Order. The International Union Defendants urge the Court to dismiss Titan's Interference Claims as the only appropriate sanction for Titan's failure to implement a procedure to preserve relevant email. However, the Court recognizes that Titan's email violations are somewhat tempered by the fact that the International Union Defendants have not been completely deprived of production of relevant email. Titan states that it "has now produced 4076 pages of preserved e-mail . . . ." <u>Titan's Response</u>, pg. 13. Further, third-parties have also produced email, as demonstrated by the International Union Defendants' exhibits. <u>Defendants' Response to Compliance</u>, Exhs. 3-9. Accordingly, the Court will not recommend dismissal of the Interference Claims. However, Titan must be sanctioned for its failure to properly perform its duties relating to email under the November 2000 Order.

Therefore, Titan is ordered to pay all reasonable attorney fees and costs incurred by the International Union Defendants in the preparation and filing of its Motion for Discovery Sanctions. The Court understands that Titan has provided 4,076 pages of emails to the International Union Defendants.

However, out of an abundance of caution, Titan is ordered to produce to the International Union Defendants <u>all</u> relevant email sent to Titan, as well as any documents attached thereto, <u>all</u> relevant email sent by Titan, as well as any documents attached thereto, and <u>all</u> relevant email sent internally within Titan, as well as any documents attached thereto, from the initiation of the Titan's corporate email system in 1999 through December 31, 2002 and provide same to the International Union Defendants by September 2, 2005.[7] Titan is

---

[7]The Court notes that its order includes any email sent to Mr. Taylor at the "mtaylor@titan-intl.com" or "jbichsel@titan-intl.com" addresses, or sent from Mr. Taylor through the "mtaylor@titan-intl.com" or "jbichsel@titan-intl.com" addresses. It also includes email sent to Mr. Taylor or his agent, and email sent by Mr. Taylor or on his behalf by his agent, at any other Titan-related email address unnamed by the Court.

The 1999 through December 31, 2002, period was drawn from Titan's submissions to the Court. Alfred W. Jones, Titan's Director of Information Services, attested that Titan created an external email system in March 1999, and an internal email system in May 1999, which was then installed throughout Titan's facilities by early 2000. See Plaintiffs' Response to International Union Defendants' Motion For Discovery Sanctions (d/e 253), Exh. T, Affidavit of Alfred W. Jones, ¶ 5.

The end of the year 2002 appears to be the discovery cut-off date in this case. See Motion for Sanctions, Exh. Z, October 6, 2004, Letter from J. Tharp to M. Clash-Drexler, pgs. 1-2 (". . . the [PriceWaterhouseCoopers] papers that have been produced include Titan financial data through the end of 2002 . . . . There is certainly no basis for the production of documents generated in 2003 and after–which probably explains why we have not received any such documents from the defendants."). The International Union Defendants' response to the October 6, 2004, Letter, did not dispute the year-end 2002 cut-off date. See id., Exh. DD, October 20, 2004, Letter from M. Clash-Drexler to J. Tharp.

directed to prepare an appropriate privilege log for any emails not provided to the International Union Defendants.

## CONCLUSION

For the aforementioned reasons, and in accordance with the Court's ruling in its May 5, 2005, Order (d/e 163), the remainder of the International Union Defendants' Motion for Discovery Sanctions and Memorandum in Support Thereof (d/e 244) is ALLOWED. Titan is ordered to pay all reasonable attorney fees and costs incurred by the International Union Defendants in the preparation and filing of its Motion for Discovery Sanctions. The Court directs the International Union Defendants to file an affidavit setting forth their reasonable attorney fees and costs on or before September 2, 2005. The Court will review the affidavit(s) of reasonable attorneys fees and costs and enter an appropriate order thereafter. Further, Titan is ordered to produce to the International Union Defendants all relevant email sent to Titan, as well as any documents attached thereto, and all relevant email sent by Titan, as well as any documents attached thereto, and all relevant email sent internally within Titan, as well as any documents attached thereto, from the initiation of the Titan's corporate email system in 1999 through December 31,

2002 and to provide same to the International Union Defendants by September 2, 2005.

IT IS THEREFORE SO ORDERED.

ENTER:     August 19, 2005

                                                s/ Byron G. Cudmore
                                                BYRON G. CUDMORE
                                         UNITED STATE MAGISTRATE JUDGE